## Humpich's Trustees et al. v. Louisville Gas & Electric Co., Inc.

(Decided June 25, 1937.)

B. M. HARWOOD, R. F. PEAK and M. M. HELLMANN for appellants.

WILSON W. WYATT and PETER, HEYBRUN, MARSHALL & WYATT for appellee.

OPINION OF THE COURT BY CREAL, COMMISSIONER—Affirming.

At the time of his death, Ben Humpich was the owner of a lot in Louisville, Ky., on Fulton street now known as River road and opposite the lower portion of Tow Head Island in the Ohio river.

In March, 1935, Matilda Humpich and Theodore J. Humpich, as devisees under the will of Ben Humpich, instituted this action against the Louisville Gas & Electric Company, a corporation, seeking to recover damages for the inundation of a portion of this lot by the water of the Ohio river alleged to have been caused by the erection of dam No. 41 at and along the falls of the Ohio river at Louisville. At the close of the evidence the court peremptorily instructed the jury to find for the defendant and this appeal is from a judgment entered in conformity with the directed verdict.

Many years ago the government erected a navigation dam at the falls of the Ohio river from the Indiana shore to the head of the Louisville & Portland Canal along the Kentucky shore. The crest of this dam was at an elevation of 412 feet above the mean sea level. By means of this dam the river could be kept at a 9-foot stage in all seasons between Louisville and Madison, Ind., a distance of approximately 50 miles. This dam was supplanted by a new dam completed in 1927. The federal government let the contract for the construction of approximately 8,000 feet of the new dam under competitive bidding. That portion of the dam begins at the Indiana shore above the Pennsylvania railroad bridge and runs into and at right angles with the river for a distance of about 1,000 feet and then down and somewhat parallel with the river for a distance of approximately 7,000 feet to a point about 650 feet from the banks of the river at Shippingport.

In December, 1923, the Louisville Hydro-Electric Company, a corporation, made request to the federal power commission for power development at dam No. 41 and on November 11, the license or permit was granted under which the applicant built a power plant connected with and extending from the dam constructed by the government to the Kentucky shore at Shippingport thus completing the dam from the Indiana shore to the Kentucky side. The fixed and permanent portions of the dam are at an elevation of 420 feet above mean sea level and movable portions when in place bring the entire dam up to that elevation thus raising the level of the pool that may be maintained at normal times 8 feet above that which could be maintained by the old dam at such times.

It is stipulated by the parties that the Louisville Hydro-Electric Company and the Louisville Gas & Electric Company may for the purposes of this litigation be treated as the same.

Some controversy was made in pleading concerning appellants' title to the lot and their right to maintain the action, but that apparently was without merit and has been abandoned.

Appellee admits that the increase in the level of the pool above the dam has caused the water to overflow a portion of appellant's lot, thus recognizing a taking of the property for public purposes within the purview of section 242 of our Constitution, but as said in brief, "Its defense, as stated succinctly, is simply that it did not cause the inundation and is not now responsible for it."

A copy of the license granted to appellee by the federal power commission was introduced in evidence and is found in the record. It sets forth at length the terms and conditions upon which the license was granted. It was duly executed by the federal power commission and its terms and conditions accepted by the Louisville Hydro-Electric Company and thereupon became the contract between the parties. It is the contention of appellants that the power plant constructed and maintained by appellee forms a portion of the dam and without which the increased level of the pool could not be maintained and therefore appellee is liable for the damage complained of. The evidence shows beyond question that the primary purpose of the dam was navi-

gation. Over 8,000 feet of the dam were constructed and are owned by the government. There are movable sections known as Chanoine and Boule weirs or wickets and bear traps of an aggregate length of 4,642 feet. The Chanoine weirs which are 860 feet in length have a sill elevation of 406 feet above mean sea level and the Boule weirs which are something over 361 feet in length have a base elevation of 410 feet above such level and the bear traps which are 182 feet in length have a base elevation of 405 feet. These are under the absolute control of the government and are removed or raised and lowered at the direction of its engineers. In the event of rising tides the movable portions are removed or let down by government engineers to permit the water to pass freely through and at some stages vessels pass through and over the dam rather than through the canal. So far as the use of the water is concerned, appellee is under the direction and control of the government and may at any time be required to close a part or all of its units or in the event a vessel becomes grounded in the pool below the dam, it may be required to open all its units to raise the level in the lower pool and if this is not sufficient, then the weirs are lowered by government employees to permit more water to pass through to the lower pool. The government at normal stages of the river has and exercises absolute control over the level of the pool above the dam and may maintain it to the full height of the dam or may reduce it to the lowest sill or base of the weirs, some of which are several feet below the crest level of the old dam. It is quite manifest that if the license had not been granted to appellee, the government would have completed its dam to the Kentucky shore at Shippingport. Therefore to all intents and purposes the situation is the same as if the dam had been so completed and then appellee had been permitted to make openings in it for the purpose of letting water pass through its turbines or other means of generating power. If this had been done, it certainly could not be maintained that appellee would be liable.

Article 15 of the license provides that:

"The maintenance of the upper pool level between elevations 420 feet and 418 feet mean sea level and the use of the water shall be under the control of said U. S. District Engineer; Provided,

that the dam is built to a crest elevation of 420 feet.''

Under the license, everything that appellee had done or may do is made subject to the control and supervision of the United States government engineers. Under the license, appellee pays the United States for the use of the government dam and other structures and the land adjoining and pertaining thereto owned by the United States the sum of $95,000 and this is later urged by appellants as sustaining their position, but for reasons already indicated we do not so view it.

Appellants also rely on the provisions of article 10 of the license which provides in effect that the licensee shall be liable for damages occasioned to others by the construction, maintenance, or operation of the plant and that in no event shall the United States be liable therefor. But it is manifest that the United States could not by contract evade liability as to third parties nor as to third parties could it impose liability on appellee where none existed. Furthermore, it is to be doubted if the contracting parties had in mind damages of this character when this provision was inserted in the license.

Since as shown by the evidence admitted, this is primarily a navigation dam and the United States government has absolute control and supervision over the levels of the pool above the dam and appellee has no control whatever over it or even of the quantity of water it may use, the United States alone is liable for damages, if any, that appellants may have sustained. However, appellants after they had closed their case and upon cross-examination of witnesses for appellee offered in evidence an entirely new matter consisting of an exhibit used in a case in the United States Court of Claims. This exhibit contained letters between officials or employees of the department of government relating to the construction of dam No. 41 and would tend to indicate that the dam was raised 2 additional feet at the request of appellee and that the $95,000 rental to be paid by appellee was to cover interest on the additional costs of raising the dam 2 feet in height. The court refused to admit the exhibit in evidence because when it was offered on cross-examination of one of appellee's witnesses, appellants had closed their case and should not be permitted to go back and open up entirely new matters. The court has discretion in matters of this

kind and it is apparent that there was no abuse of that discretion in this instance, however, we need not determine that matter since for other and unquestionably valid reasons, unnecessary to enumerate, the admission of the evidence should have been refused.

Judgment affirmed.

Whole court sitting.